UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

    -v.-                                        :          17 Cr. 684 (ER)

EMANUEL RICHARDSON,                         :

                  Defendant.            :

----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                                  :          17 Cr. 684 (ER)

EMANUEL RICHARDSON,                          :

                Defendant.              :

-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Emanuel Richardson is scheduled to be sentenced on Thursday, June 6, 2019, at 11:00 a.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 237) ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant abused his role as a men's basketball coach and mentor to student-athletes by accepting multiple cash bribes – totaling $20,000 – in exchange for steering these athletes to retain the services of co-defendant Christian Dawkins upon turning pro.  Instead of prioritizing his student-athletes' best interests, Richardson sought to profit from them, treating the student-athletes that he coached as assets that he could control for his own benefit.  Richardson agreed to steer certain of the student-athletes that he coached to Dawkins and his newly formed company, not because he believed that they were talented or reputable advisors who would best safeguard the athletes' newfound wealth, but because he was being paid to do so.  As Richardson well knew, Dawkins had been a runner for a major sports agency firm until having been recently fired due to allegations of misusing an NBA player's credit card, and had no experience as an athlete-

1

advisor.  Although the student-athletes were not the legal victims of the bribery scheme, they were unquestionably intended to be harmed by the defendant's conduct, which jeopardized not simply their collegiate careers but their ability to make one of the most important decisions of their future professional careers.

Richardson's conduct not only victimized the student-athletes that he coached.  It also victimized the University of Arizona, which employed him.  Regardless of whether one agrees or disagrees with the NCAA rules, Richardson undoubtedly had a duty to follow those rules and to ensure that the University of Arizona's men's basketball program abided by them.  His acceptance of bribes in order to steer University of Arizona men's basketball players flagrantly violated those rules in myriad ways, and were a very clear breach of his duties to the University of Arizona, exposing it to potentially significant adverse consequences.

In light of all of these considerations, and as is described in further detail below, the Government respectfully submits that a sentence within the applicable Guidelines range of 18 to 24 months' imprisonment is appropriate and sufficient but not greater than necessary to promote the legitimate ends of sentencing.

## BACKGROUND

### A.  The Defendant and the Offense Conduct

The defendant was an assistant coach of the University of Arizona's men's basketball team from in or about 2009 until his arrest on September 26, 2017. (PSR ¶ 41).  In or about March 2017, Richardson and Munish Sood – a financial advisor working with Christian Dawkins – met in Las Vegas for the first time.  Thereafter, Richardson and Sood spoke by phone in April 2017, during which call Sood (who was not at that time yet cooperating with the Government) offered to provide financial assistance to Richardson in connection with Richardson's financial needs. (PSR ¶ 60).

After Dawkins was terminated by ASM Sports following allegations coming to light that he misused a client's credit card (PSR ¶ 61), Dawkins, Sood and a third investor known as Jeff D'Angelo, who in reality was an undercover agent ("UC-1"), started a new sports management company called Loyd Inc. (PSR ¶ 64). During conversations between Dawkins, Sood, and UC-1, among others, Dawkins proposed that Richardson would be a good assistant basketball coach for the company to pay to steer them players, and that working with Richardson would make sense because Richardson had access to top 10 NBA draft picks every year. (GX 508AT; Complaint ¶ 87).[1]

Thereafter, Dawkins arranged for Richardson to meet with Sood, UC-1, and others in Manhattan on or about June 20, 2017. (PSR ¶ 66). During a telephone call in advance of that meeting, Dawkins and Richardson discussed that Dawkins anticipated UC-1 would have $5,000 for Richardson at the meeting. Richardson and Dawkins also discussed a high school player that Richardson needed money to recruit during this call. (PSR ¶ 65; GX 101T). At the meeting, Richardson received the $5,000 cash bribe payment as Dawkins had advised him would occur. During the discussion at the June 20, 2017 meeting, Richardson stated, among other things, that he could guarantee a particular player on the University of Arizona team, Rawle Alkins, would sign with Dawkins and his new company and that Richardson was willing to direct certain players that he coached to retain the services of Dawkins and the new company. (PSR ¶ 66; GX 509B1T-509B4T). For example, when discussing an incoming freshman on the University of Arizona's men's basketball team, De'Andre Ayton, Richardson stated "it's not about well, hey, we're gonna be one of three. Excuse my expression, fuck that. Deandre, this is what you're

---

[1] Unless otherwise noted, GX references are to Government Exhibits admitted into evidence in the trial of *United States v. Christian Dawkins and Merl Code*, (S1) 17 Cr. 684 (ER). Transcript references, unless otherwise noted, are to the trial transcript.

doing." (GX 509B1T). Richardson further promised to put the group in direct contact with the players that he coached so that they could ultimately succeed in recruiting them as clients when the players turned pro. (GX 509B2T). In addition, Richardson touted his influence with his players as a result of his role as an assistant coach, specifically talking about how he could "take the risk out of the room because, guess what, I'm with them all the time" (GX 509B1T), and that his players were "always gonna defer to [him]" and that "if a question is asked, they're gonna look at me . . . I'm like – that's what they know." (GX 509B3T).

After the June 20, 2017 meeting, Richardson quickly requested more money from Dawkins and his new company. In particular, Richardson sought $15,000 from Dawkins in or about early July 2017. Richardson informed Dawkins that he needed this money in order to provide it to the mother of a top high school basketball player, Jahvon Quinerly, so that the player would commit to attending the University of Arizona. (Complaint ¶ 91; GX 114). Dawkins thereafter relayed this request to Sood and UC-1, who agreed to provide the money in exchange for Richardson's effort to steer Quinerly to sign with Dawkins and his new company. (Complaint ¶ 92; GX 142). Dawkins and UC-1 spoke about the fact that this $15,000 payment would represent three months of $5,000 monthly payments that had been promised to Richardson. Dawkins thereafter conveyed to Richardson that UC-1 would provide the $15,000 that Richardson had requested, and Richardson agreed that this sum would represent 3 months' worth of his monthly payments and that he would start receiving payments again in October. (GX 114T) ("Do that, and then like I said, then let's start something like July, August September, you know, October, if you want.").

On or about July 20, 2017, Richardson travelled to Sood's office in New Jersey, where he was handed the $15,000 cash bribe that he had previously requested. During this meeting,

Richardson discussed with Sood and UC-1, among other things, that going forward he would no longer give his players options in terms of which advisor to select, and that he would use his influence to direct these players just to sign with one advisor – Dawkins' new company. (Complaint ¶ 94; GX 511B5T).  Richardson discussed specific players with UC-1 and Sood that Richardson promised to steer to Dawkins and the new company.  At the time Richardson was paid the $15,000, UC-1 confirmed with him that they would treat the money as three months' worth of the $5,000 monthly payments they had agreed he would be receiving going forward. (Complaint ¶ 94; GX 511B6T).  On or about August 9, 2017, Quinerly publicly committed to attend the University of Arizona. (Complaint ¶ 95).

A few weeks later, on or about August 30, 2017, Richardson met with Dawkins, Sood, and another individual posing as UC-1's business partner ("UC-2"), who was, in reality, an undercover agent near the campus of the University of Arizona.  During this meeting, Richardson and Dawkins discussed how Richardson needed to be assertive in directing a player on the University of Arizona basketball team, Rawle Alkins, to sign with Dawkins' new company:

> DAWKINS: Yeah, he's fucking clueless, clueless. But that's good for us because (U/I), I showed him a breakdown of everything, if he can -- I think that he'll do what you tell him to do.
>
> RICHARDSON: He will.
>
> DAWKINS: I think that he'll do exactly -- you have to be very specific with him, very clear cut, like to the point where you're almost talking to like a three-year-old.

(GX 518BT).  Richardson again promised during this meeting to use his influence as a coach to steer his players to sign with Dawkins. (Complaint ¶ 99).

During this same trip, as arranged for by Richardson, UC-2, Sood, and Dawkins also met with a cousin and "handler" of Alkins.  UC-2 thanked Richardson for facilitating this meeting,

and Richardson responded, "I did my job." (Tr. 879:25 - 880:13).  Thereafter, as had been

arranged by Richardson, Dawkins, Sood, and UC-2 met with the cousin and "handler" of Alkins.

During that meeting, Alkins' cousin indicated, in substance and in part, that Richardson had

recommended to the cousin that Alkins should work with Dawkins and his new company.  (Tr.

882:10-20; *see also* Complaint ¶ 100).[2]

On or about September 26, 2017, Richardson, Dawkins, and others were charged and

arrested for various offenses, including bribery.  Richardson was immediately put on paid

administrative leave, and was eventually terminated for cause by the University of Arizona.   In

or about October 2017, Jahvon Quinerly, who had originally committed to the University of

Arizona in August 2017, decommitted and later chose to attend a different university.

## B.  The Charges and the Defendant's Guilty Plea

Indictment 17 Cr. 684 (ER) charged Richardson, Dawkins, Merl Code and two other

coaches in multiple counts with participation in the bribery scheme described above.  On January

22, 2019, the defendant pleaded guilty to Count One of the Indictment, which charged

conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and he also agreed to forfeiture of

$20,000.  On May 8, 2019, after a two and half week trial, a jury found co-defendants Dawkins

and Code guilty of conspiracy to commit bribery, and Dawkins guilty of the substantive crime of

bribery.

## C.  The Applicable Guidelines

As set forth in the parties' plea agreement and by the Probation Office, the base offense

level is 12; a two level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the

---

[2] Richardson claims in his submission that he "never recommended the co-defendants' firm" to
either Quinerly or Alkins. (Def. Mem. at 6).  This is belied by the trial record and what Alkins'
cousin told Dawkins, Sood, and UC-2 during their meeting in August 2017.

offense involved more than one bribe; a four-level increase is warranted pursuant to

§ 2C1.1(b)(2) because the value of the payments made to Richardson exceeded $15,000 but was

less than $40,000; and a three-level decrease is warranted pursuant to U.S.S.G. § 3E1.1(a) and

(b) due to the defendant's acceptance of responsibility, resulting in a total offense level of 15.

(PSR ¶ 88-98).  The defendant has zero criminal history points and is in Criminal History

Category I. (PSR ¶ 101).  Accordingly, the applicable Guidelines range is 18 to 24 months'

imprisonment. (PSR ¶ 135).

## DISCUSSION

As the Court is aware, the Sentencing Guidelines still provide strong guidance to

sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v.

Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study

based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the

Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id*. at 49.

After that calculation, however, the Court must consider the seven factors outlined in Title 18,

United States Code, Section 3553(a), which include the nature and circumstances of the offense,

the history and characteristics of the defendant, the need to adequately deter criminal conduct

and promote respect for the law, and the need to protect the public from further crimes of the

defendant.  *Id*. at 50 & n.6.

Here, a Guidelines sentence is appropriate and would meet the objectives set forth in 18

U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; and (B) to afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a)(1),

(2)(A)-(B).

    A.  <u>The Nature and Seriousness of the Offense</u>

       Richardson's offense was undoubtedly serious.  Richardson accepted multiple bribes

totaling approximately $20,000, and expected to continue to receive $5,000 monthly bribes

going forward, which never occurred due to his September 2017 arrest.  In return for this money,

he agreed to use his influence as a coach at the University of Arizona to steer his young players

to sign with Dawkins and his company.  Richardson did not just agree to do this – he actually

began to take action in return for the money he received, including by facilitating a meeting for

Dawkins, Sood, and UC-2 with the cousin and handler for Rawle Akins and, according to the

handler, vouching for and advocating for Alkins to sign with Dawkins' new company.

Richardson undoubtedly was taking these steps because he was being paid by Dawkins and his

business associates to do so, unbeknownst to Alkins or his cousin.

       By accepting these bribes and acting to steer his players in exchange for them,

Richardson betrayed the interests of the young student-athletes that he coached.  These were

players that Richardson was expected to mentor, not to exploit for his own personal profit.  Yet

during recorded meeting after recorded meeting, Richardson openly discussed using the role he

played as a coach and mentor to his players in order to influence and steer them to sign with

Dawkins, a man who had no experience as a sports agent and had recently been terminated from

his prior agency due to allegations of misusing a client's funds.  As described above, rather than

acknowledge his responsibility to help advise young student-athletes under his charge,

Richardson, in order to secure bribe money from Dawkins and UC-1, was recorded bragging

about how he could simply tell those student-athletes who to sign with because they trusted him.

Moreover, Richardson implicated the eligibility of these players to compete in NCAA competition unbeknownst to the players.

Equally importantly, Richardson betrayed the duties that he owed to his employer.  His actions were clear cut and serious NCAA rules violations and violations of his university's policies.  Richardson's desire to profit for himself exposed the University of Arizona to significant adverse consequences, some of which the university has already felt and others that may still come in the form of NCAA penalties and sanctions.  As is detailed in the University of Arizona's victim impact statement (annexed hereto as Exhibit 1), Richardson's conduct has already caused significant harm to the university, including causing multiple recruits to the Arizona men's basketball team to decommit:

> [N]ews of the criminal charges against Mr. Richardson caused enormous pain and disruption not only to the University's men's basketball team but across the entire campus, as well. Mr. Richardson's actions have caused – and continue to cause – significant damage to the reputation of the University, its athletics program, and most specifically to a men's basketball program that had previously enjoyed a stellar record of success, on and off the court. Several highly regarded student-athletes de-committed from the University upon hearing this difficult news, and the recruitment effort for future players became substantially more challenging . . . . The University is also facing the prospect of potentially significant sanctions and penalties from the NCAA flowing from the unlawful actions involved in this case.

(Exhibit 1, at 2).  The University of Arizona has also had to hire outside legal counsel in connection with the criminal case, as well as to hire legal counsel to address the investigation being conducted by the NCAA Enforcement staff as a result of Richardson's activities. (*Id.*).

In his submission, Richardson tries to minimize the seriousness of his conduct in multiple respects.  First, despite the obvious fact that his conduct will result in the NCAA ultimately imposing sanctions against the University of Arizona, Richardson claims that he "did not intend to harm the University of Arizona in any way" and notes that "the NCAA has not imposed any

monetary fines or other penalties upon Arizona or any other university involved in the case."
(Def. Mem. at 10-11). Of course, as Richardson's counsel well knows, the NCAA has yet to
impose sanctions on any of the universities who had coaches accept bribes and, in fact, the
NCAA deferred conducting its own investigation and imposing penalties until after the federal
criminal cases had concluded. As is noted in the University of Arizona's victim impact
statement, the NCAA's investigation is "just now getting underway in the aftermath of the
criminal trial." (Exhibit 1, at 2). Future penalties could include, among other things, limitations
on a university's participation in postseason play; financial penalties including requirements that
an institution pay a fine, return revenue received from a specific athletics event or series of
events, or reductions in or elimination of monetary distribution by the NCAA; limitations on the
number of athletic scholarships that may be provided by the university to student-athletes in the
future; and recruiting restrictions including restrictions on the ability to conduct off-campus
recruiting activities. (PSR ¶ 34). For these reasons, Richardson's claim that he did not intend to
harm the University is, at best, misleading; while he may have hoped never to get caught and
thereby risk harm to the University, Richardson – with vast experience in NCAA basketball –
was well aware of what would or could happen were his bribery scheme exposed, and acted in
spite of this.

Second, Richardson claims that "the two student athletes that Mr. Richardson was
supposed to refer to Dawkins' agency have never been suspended or ruled ineligible by the
NCAA," that he "never gave them the money and *did not jeopardize their careers in basketball*."
(Def. Mem. at 10)(emphasis added). It is not clear why Richardson pocketing the $20,000 in
bribe money entirely for himself makes his conduct *less* egregious, but even if that is what
happened, the mere fact that Richardson accepted this money and told others that at least certain

portions of it would be provided to the family members of these players in and of itself exposed

these players to significant eligibility issues.  An assistant coach telling third parties – and in

particular agents and advisors seeking to recruit a player – that he was paying these players'

families in order to recruit them certainly exposed the players to significant risks, including the

risk of loss of eligibility and athletic scholarship.  That the NCAA never suspended these players

or deemed them ineligible does not mean that Richardson did not expose the players to the risk

that this would occur.

    B.  <u>Deterrence</u>

Second, and beyond the seriousness of the offense, deterrence militates in favor of a

Guidelines sentence.  While the Government is prepared to accept Richardson's representation

that further specific deterrence is unnecessary, general deterrence, in particular, is an important

factor that the Court should consider in imposing sentence.  Indeed, as Richardson notes in his

own submission (Def. Mem. at 11-12), and as the series of cases charged by the Government in

September 2017 makes abundantly clear, there is reason to believe that others in college

basketball may be engaged in similar conduct.  This Court should send a strong message to other

college men's basketball coaches that accepting bribes in order to steer student-athletes to

particular agents and advisors is harmful, criminal conduct that will result in actual prison time,

and is not a mere NCAA rules violation.  The non-custodial sentence proposed by Richardson

would simply be inadequate to promote the interests of general deterrence.

The fact that the payments to Richardson – all of which were in cash – are extremely

difficult for universities and the NCAA to detect should also be considered by this Court in

imposing sentence.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner,

J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that

either are lucrative or are difficult to detect and punish, since both attributes go to increase the
expedited benefits of a crime and hence the punishment required to deter it."); *see also United
States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (same).

With respect to deterrence, Richardson argues that his own public humiliation (including
the fact his case was widely reported in the sports media), his loss of employment, and the fact
he will likely never work again in college basketball are sufficient to promote deterrence. (Def.
Mem. at 12).  But of course, the fact that Richardson lost his job for committing a crime –
particularly one that so adversely impacted his former employer – is unremarkable and is
indistinguishable from numerous other white collar cases, and specifically bribery offenses
involving private sector actors.

The Government does not dispute that Richardson has suffered collateral consequences
as a result of this prosecution.  However, collateral consequences for white-collar defendants are
commonplace and do not, in and of themselves, justify a non-custodial sentence.  If this were not
so, then most white-collar defendants would never see the inside of a jail cell.  Many courts over
the years have recognized that the mere fact that a defendant has more to lose as a result of his
position in society does not, in and of itself, justify a lesser sentence, and that giving such an
argument undue weight would unfairly favor white-collar criminals above others.  *See United
States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (vacating former city councilor's four-month
sentence for Hobbs Act extortion and false statements offenses, which sentence varied
downwardly 88% from a Guidelines range of 31 to 44 months, where the variance was premised
significantly on the collateral consequences of conviction faced by the defendant), *vacated on
other grounds by* 552 U.S. 1173 (2008); *id.* at 106-07 (noting that giving substantial variances in
sentencing to white collar defendants who "often have achieved more tangible successes than

other defendants . . . will inevitably lead to sentencing courts treating white collar defendants more leniently (in the relative sense) simply because of their societal status -- a result that would be contrary to one of Congress' primary objectives in enacting the current federal sentencing scheme"); *United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) (noting that "[e]very convicted felon suffers from the indignity and ill-repute associated with a criminal conviction," and that reliance on such so-called "collateral consequences is contrary to 18 U.S.C. § 3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants").  Moreover, the fact that Richardson was a prominent individual in the world of college basketball and that his criminal activities have been widely reported on in the sports media likewise does not justify a lesser sentence. *See, e.g., United States v. Cutler*, 520 F.3d 136. 171 (2d Cir. 2008).

## CONCLUSION

For the aforementioned reasons, the Government respectfully submits that a Guidelines sentence is appropriate.


Dated:  New York, New York
          May 31, 2019

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

                        By:     s/ Noah Solowiejczyk_____
                                        Robert L. Boone
                                        Noah Solowiejczyk
                                        Eli J. Mark
                                        Assistant United States Attorneys
                                        (212) 637-2208/2473/2431