J669RICS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                          17 CR 684 (ER)

5   EMANUEL RICHARDSON,

6                   Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            June 6, 2019
9                                           11:02 a.m.

10

    Before:
11
                        HON. EDGARDO RAMOS
12
                                            District Judge
13

14                          APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    NOAH D. SOLOWIEJCZYK
17  ROBERT L. BOONE
    ELI J. MARK
18       Assistant United States Attorneys

19  MORDOCK BARBER LLC
         Attorney for Defendant
20  CRAIG J. MORDOCK

21

22

23

24

25

J669RICS

1            (Case called)

2            MR. SOLOWIEJCZYK:  Good morning, your Honor.

3            Noah Solowiejczyk, Robert Boone and Eli Mark for the

4     government.

5            THE COURT:  Good morning.

6            MR. MORDOCK:  Good morning, your Honor.

7            Craig Mordock on behalf of Emanuel Book Richardson.

8     Mr. Richardson is present in the court.

9            THE COURT:  Good morning to you both.

10           This matter is on for sentencing and in preparation

11    for today's proceedings I have reviewed the following.  I have

12    reviewed the presentence report last revised on April 12, 2019

13    prepared by U.S. probation officer Stephanie McMahon which

14    includes a recommendation.

15           I've also reviewed the sentencing letters submitted by

16    Mr. Moore filed May 20, 2019 which includes letters by several

17    of Mr. Richardson's friends.

18           And I have reviewed the government's submission dated

19    May 31, 2019 which includes the victim-impact statement

20    submitted by the general counsel of the University of Arizona.

21           Is there anything else that I should have received or

22    reviewed?

23           Mr. Solowiejczyk.

24           MR. SOLOWIEJCZYK:  Not from the government.  I believe

25    Mr. Mordock has one additional letter.

J669RICS

1          THE COURT:  OK.  Mr. Mordock.

2          MR. MORDOCK:  Your Honor, I have one letter from

3    Mr. Richardson's wife.  I'd like the Court to review it in

4    consideration of sentence.

5          THE COURT:  Absolutely.

6          Has the government already seen it?

7          MR. MORDOCK:  Yes, your Honor.

8          (Pause)

9          MR. SOLOWIEJCZYK:  Your Honor, there is one matter we

10   wanted to take up before the sentencing began in earnest.  In

11   reviewing the transcript of the plea proceedings in preparation

12   for sentencing -- I have discussed this with Mr. Mordock -- we

13   do believe that there was at least one aspect of the allocution

14   that was lacking and I believe Mr. Richardson is prepared to

15   make a brief additional statement at this time.

16         THE COURT:  Very well.

17         Mr. Mordock.

18         MR. MORDOCK:  Yes, your Honor.

19         Mr. Richardson is prepared to make a statement just to

20   clarify what was in the allocution.  I believe he may have,

21   while he was reading, forgot a sentence.  And he's prepared to

22   do that today in terms of stating the facts under 18 U.S.C.

23   666.

24         THE COURT:  OK.  Is he just going to read that one

25   sentence?

J669RICS

1          MR. MORDOCK:  However the Court -- I don't know how

2     the Court would need it for the transcript.

3          THE COURT:  How long is the entire statement?

4          MR. MORDOCK:  It was just really a line that needs to

5     be corrected, your Honor.

6          THE COURT:  Well I mean just so that I understand

7     what's missing, what is --

8          MR. MORDOCK:  Go ahead.

9          MR. SOLOWIEJCZYK:  I can give some context if that's

10    helpful.

11         THE COURT:  Please.

12         MR. SOLOWIEJCZYK:  Mr. Richardson in his prior

13    allocution, which I'm happy to provide a copy to the Court, he

14    talked about setting up meetings for Mr. Dawkins.  He talked

15    about -- but he didn't really talk about the fact that he was

16    receiving money in exchange for doing that.  That was the thing

17    that was missing.  That was the statement that Mr. Richardson

18    was going to make here today.

19         THE COURT:  Very well.

20         Mr. Richardson.

21         THE DEFENDANT:  Good morning, your Honor.  Just wanted

22    to let the Court -- let the government know I accepted money

23    for arranging meetings with student athletes.

24         THE COURT:  OK.  Mr. Solowiejczyk do you wish me to

25    make any further inquiry?

J669RICS

          MR. SOLOWIEJCZYK:  Who he set the meetings up for.

          THE COURT:  For whom did you set up the meetings,
Mr. Richardson?

          THE DEFENDANT:  With student athletes.

          THE COURT:  For whom?  At whose behest?

          THE DEFENDANT:  Excuse me.  I set up meetings with
student athletes for Christian Dawkins.

          MR. SOLOWIEJCZYK:  We're satisfied, your Honor.

          THE COURT:  Very well.

          Thank you, Mr. Richardson.

          Mr. Mordock have you read the presentence report and
discussed it with your client?

          MR. MORDOCK:  I have, your Honor.

          THE COURT:  Mr. Richardson, have you received a copy
of the presentence report and discussed it with your attorney?

          THE DEFENDANT:  Yes, I have, your Honor.

          THE COURT:  Are there any objections to the report
regarding its factual accuracy?

          MR. MORDOCK:  No, your Honor.

          THE COURT:  Very well.  Although I am not required to
impose a sentence within the applicable guidelines range, I am
required to consider the range in imposing sentence and,
accordingly, I need to do the calculation.

          Mr. Richardson pleaded guilty to Count One of the
indictment which charges him with conspiracy to commit bribery

J669RICS

1    in violation of 18 U.S.C. Section 371.  That offense carries a

2    base offense level of 12, to which two levels are added because

3    Mr. Richardson received more than one bribe, and an additional

4    four levels are added because the approximate total of the

5    bribes that he received was $20,000.  Three levels are deducted

6    for Mr. Richardson's acceptance of responsibility, yielding a

7    total offense level of 15.

8            Because Mr. Richardson has no prior convictions he is

9    in criminal history category I.

10           Are there any objections to that calculation,

11   Mr. Solowiejczyk?

12           MR. SOLOWIEJCZYK:  No, your Honor.

13           THE COURT:  Mr. Mordock?

14           MR. MORDOCK:  No, your Honor.

15           THE COURT:  Very well.  Based on the parties'

16   representations that they agree with the calculation, the same

17   calculation that's set forth in the presentence report, I

18   accept the calculation in the presentence report and find that

19   Mr. Richardson is in criminal history category I and that the

20   total offense level is 15, yielding a guidelines range of 18 to

21   24 months.

22           Mr. Solowiejczyk, does the government wish to be heard

23   before the imposition of sentence?

24           MR. SOLOWIEJCZYK:  Briefly, your Honor.

25           I'm not going to go over everything that was in our

J669RICS

1    papers.  Just very briefly.  I think your Honor is aware that

2    this conduct was serious and had serious consequences for

3    Mr. Richardson's university, the University of Arizona.  Those

4    consequences included some things that have already happened,

5    some things that are still to come.  The things that have

6    already happened included student athletes de-committing from

7    the university, harm to the reputation to the school.  What's

8    still to come and is, in the University of Arizona's

9    victim-impact statement, is the NCAA has now begun an

10   investigation in earnest and it's very likely there will

11   ultimately be penalties and sanctions imposed on the

12   university.  That's one aspect of the harm that was caused

13   here.

14           THE COURT:  Do you know that for a fact that the NCAA

15   has, in fact, commenced an investigation of the University of

16   Arizona?

17           MR. SOLOWIEJCZYK:  Based on the letter from the

18   University of Arizona that's our understanding, your Honor.

19           THE COURT:  OK.

20           MR. SOLOWIEJCZYK:  The conduct here, though, is

21   serious in another respect and that is there are really two

22   ways that the student athletes were impacted by what

23   Mr. Richardson did.  The first is -- I don't think this can be

24   overstated.  What Mr. Richardson was ultimately agreeing to do

25   was take money secretly and in exchange for that steer the

J669RICS

student athletes that trusted him, that he had influence over,
to sign with Christian Dawkins and his new company.  The
student athletes did not know Mr. Richardson was taking money
for that purpose.  And the reality is Mr. Richardson wasn't
recommending Mr. Dawkins because this was what was in the best
interests of these kids; it's because he was taking secret
bribes.  And that's really, at the end of the day, significant
conduct that took advantage of student athletes.  And
Mr. Richardson, his job was actually to look after them.  He
was doing the opposite here.

        The other thing I would note, and we noted this in our
submission.  Mr. Richardson has taken the position in his
sentencing submission that even though he said that a lot of
this money was going to go to the families and handlers of
student athletes, that really he kept the money for himself.
And in some ways that makes Mr. Richardson's conduct more
egregious because it means he was willing to basically use the
kids that he was coaching as assets in order to try to profit
for himself unbeknownst to these student athletes.

        And from the standpoint of what kind of risk were the
student athletes put at, well, you know, a coach saying I'm
giving money to the family of a student athlete, the mere fact
the coach is saying that puts these student athletes in
jeopardy with respect to their eligibility.  I do think that
that's a serious aspect of the conduct here.

J669RICS

          A couple other factors that your Honor may want to
consider.  These are things that in some ways separate
Mr. Richardson from perhaps some of the other coaches that your
Honor is going to be sentencing or has sentenced.

          Mr. Richardson had an agreement with Dawkins and his
new company to receive $5,000 a month.  And this was an ongoing
agreement.  The only reason he didn't continue to receive that
money is because he was arrested in September 2017.  After he
received the first five thousand dollar payment in late
June 2017, Mr. Richardson initiated the next payment.  Very
soon after he came back to Dawkins and said I need another
$15,000 lump sum payment because I need to use it to recruit a
student athlete to attend Arizona.  It was Richardson
initiating that and that's an important distinction in the
government's mind.

          To get that money, Mr. Richardson traveled to
New Jersey to the offices of Munish Sood to pick up the money.
They didn't come to him.  He went to them.  As your Honor saw
during the trial, there are numerous conversations where
Mr. Richardson talked about the ways in which he was going to
steer and influence the players that he coached to sign with
Dawkins and his new company.

          The last thing I would say, your Honor, is
Mr. Richardson —- it wasn't all talk.  Later on in August
Dawkins, Sood and an FBI undercover agent went to Arizona, met

J669RICS

1    with Richardson, and then, as facilitated by Richardson, met

2    with the cousin of a current student athlete on the Arizona

3    basketball team.  And when the FBI undercover said to

4    Mr. Richardson, in some and substance, thank you -- thank you

5    for setting up the meeting; he said in response to that, I did

6    my job.

7            And, your Honor, that says a lot about the nature of

8    the quid pro quo relationship here.  During the meeting with

9    the cousin, the handler, in sum and substance, that cousin

10   indicated that Mr. Richardson had recommended Dawkins and his

11   company to the Arizona player.  So there was real action taken

12   as a result of this money at the end of the day.

13           When you take that in its totality, it's a serious

14   course of conduct.

15           The government is happy to address other relevant

16   sentencing factors including general deterrence but I think

17   something your Honor really does need to take into account in

18   fashioning an appropriate sentence is the various ways that --

19   this wasn't one mistake.  This wasn't one bad decision.  This

20   was multiple times and multiple occasions Richardson

21   consciously deciding for his own greed and his own personal

22   profit to continue down this course.

23           THE COURT:  When the does the government believe that

24   Mr. Richardson first had contact with the coconspirators here?

25           MR. SOLOWIEJCZYK:  He had known Mr. Dawkins for quite

J669RICS

1    some time, probably for a period of years, is the government's

2    understanding.  His first contact with Munish Sood was in

3    around March 2017 in Las Vegas.  They had an initial meeting

4    that was set up by Dawkins.  Then they spoke by phone again.

5            But the contact in terms of Richardson starting to

6    agree to work with Dawkins and his new company really starts

7    probably around April 2017 -- May 2017 and on, I would say,

8    your Honor.

9            THE COURT:  Thank you.

10           Mr. Mordock, is there anything that you wanted to say?

11           MR. MORDOCK:  Your Honor, yes.

12           Mr. Richardson sits here today, and after I'm done

13   he's going to get up and express remorse and regret.  He's

14   expressed remorse and regret throughout this entire process to

15   me, to his family, to the Court when he pled guilty in January.

16   He's going to do so again today.

17           That he has taken responsibility for his actions and

18   in this matter he has wound up losing everything.  He has not

19   had a job since January of 2018 other than training athletes

20   this spring and young athletes, ages 7 to 14, so not

21   college-age players.  And he was doing that for 40, 50 dollars

22   an hour.

23           He is the public face of this scandal.  He is the

24   highest profile assistant coach at the highest profile school.

25   Any time this scandal is addressed, Mr. Richardson's picture is

J669RICS

1    on the front page of the paper or the internet website that

2    that runs the story.

3         Mr. Richardson has a story.  His own personal story

4    begins long before the actions and events of 2017.  His story

5    is truly a rags to riches back to rags story in this case in a

6    professional sense, your Honor.  Not a monetary sense.  He grew

7    up in the city.  He was the product of a single mother who did

8    not necessarily have the right set of skills to raise him and

9    provide stability.  He spent his high school years sleeping on

10   couches of friends and relatives while there was crime going

11   on, violent crime going on outside.

12        He gravitated to basketball to provide that stability.

13   He took advantage -- basketball provided him with opportunities

14   in life that were not going to be present for other people in

15   his peer group.  He took advantage of those opportunities and

16   earned a business degree from Pitt-Johnstown.  He worked in

17   banking for two years and decided his real passion in life was

18   coaching and his real passion in life was helping young kids.

19   He quit his job in banking and started working as a substitute

20   teacher in New York City and coaching youth basketball, 7th

21   and 8th graders.  This was an entry level job.  He didn't do it

22   for the money.  He did it because he loved the sport of

23   basketball, because he was good at the sport of basketball and

24   he had something to share; that he continues today with the

25   youth who are gravitating to the sport of basketball.  He is

J669RICS

providing himself as a father figure to youths that may or may not have that in their life.

Judge, he wound up getting a job in amateur basketball coaching a summer program called the Gauchos.  He had three or four Division I prospects who he had mentored and coached and got them from somewhat difficult backgrounds to Division I basketball and to earn a scholarship and eventually some of them in the NBA.

He took an opportunity to coach at Xavier University in Cincinnati.  He went -- this was his first foray into college athletics.  He went there as an assistant coach.  And after two years there and some success there he went to the University of Arizona.

University of Arizona, by all counts, is probably one of the top basketball schools or top five basketball schools in the country.  They had a very good level of success.

Mr. Richardson, while being the highest profile coach in this conspiracy, he also was the lowest paid coach in this conspiracy.  And that factor and those pressures -- and I know your Honor has read the impact statement from the University of Arizona.  That's what has led to him being involved in this situation.

He was experiencing tremendous financial pressure in the spring of 2017.  And I do want -- I do think it should be made clear that the -- this conspiracy started with a man named

J669RICS

Marty Blazer, who I know your Honor heard from during the
testimony, who stole $2 million from clients.  And he's looking
for leniency.  And he creates this conspiracy.

Christian Dawkins -- Christian Dawkins on behalf of
Marty Blazer and the government approaches Mr. Richardson.
Mr. Richardson was not out there soliciting money.  OK.  And I
know your Honor has heard the conversations.  Christian Dawkins
was coaching Mr. Richardson on what to say.  Mr. Richardson was
offering Christian Dawkins an opportunity and Christian said
no, I don't need the money, you keep it, take your wife
shopping.  And I think this is really important as well.  And
this goes to show you Mr. Richardson's regret and remorse in
this scandal.

He never did give the money to the players.  And I
realize there are two sides of the same coin.  But
Mr. Richardson's thought process was he did not want to
endanger their eligibility.  He did not want to risk this.

And how do we know that these players didn't get the
money?  Well the University of Arizona says so.  They conducted
an investigation.  The player that was mentioned played the
entire 2017, 2018 season for the University of Arizona.  They
would not risk his eligibility or their season if they thought
he had received the money.

The other player went to the university -- went to
Villanova University.  Villanova University, by all counts,

J669RICS

1   runs a squeaky clean program.  They've won two national

2   championships in the last three years.  And, Judge,

3   Mr. Richardson and myself helped Villanova University ascertain

4   the facts and circumstances of what happened.  He was trying to

5   make this right.  And he made it clear to the University of

6   Villanova that he did not give Mr. Quinerly or Mr. Quinerly's

7   family any money.  Mr. Cornily played basketball this season

8   for the University of Villanova.  He was eligible.  He played

9   the entire 2018/2019 season.  I can assure the Court that if

10  there was any risk of him being ineligible, them forfeiting

11  games, he would not have been on the court for them.

12          THE COURT:  It's fortunate that they were not -- that

13  they were eligible to play.  But are you suggesting that

14  Mr. Richardson kept the bribe money in order to protect the

15  players?

16          MR. MORDOCK:  I'm suggesting that he had some regret

17  and remorse even at that point in the scandal for being

18  involved in this, that he was trying to lookout for -- he was

19  trying to lookout for his players while also enriching himself.

20          THE COURT:  OK.

21          MR. MORDOCK:  Judge, so that addresses

22  Mr. Richardson's role in the offense.  And I guess what I would

23  talk to you a little bit about, in consideration of the 3553

24  factors as well, is the sentencing disparities among similarly

25  situated defendants.  And, Judge, the prosecution has pointed

J669RICS

out that Merl Code may, in fact, be less culpable than

Mr. Richardson.  Well Mr. Code's sentencing range was I believe

24 to 30 months, less than Mr. Richardson's range.  Mr. Code

has never expressed any regret, remorse, has never admitted

responsibility.  He's gone to trial twice on this.  And Judge

Kaplan decided to sentence him to six months incarceration.  So

in this case the government's position is that Mr. Richardson,

even though he accepted responsibility, now should do three

times the amount of time that a defendant who did not accept

responsibility took.

The other thing with similarly situated defendants.

As your Honor knows, Mr. Bland was here yesterday.  Your Honor

sentenced him to probation.

Mr. Richardson and Mr. Bland have very similar life

stories.  They grew up without fathers.  They got to the

highest points of their profession.  They made a mistake and

they are paying the price for it.  They will never work in

basketball again.  And they are regretful.  And Mr. Richardson

shares the same remorse and regret that Mr. Bland does.

Now Mr. Bland's sentencing guideline was lower because

the amount of loss was only $4,000.  As your Honor knows in the

sentencing guidelines the amount of loss is very compressed at

the bottom.  So a ten thousand dollar difference means that

Mr. Richardson may be looking at 18 to 24 months where, you

know, if had been involved in a scandal that had five hundred

J669RICS

1  thousand or a million dollars, there would be no difference in

2  the sentence.  So that's what pushes this up and that's what

3  pushes the guideline.  And we feel it makes it more -- it makes

4  it greater than -- the sentence is greater than necessary under

5  the guidelines.

6           And I'll just address specific deterrence.

7           Judge, Mr. Richardson is never going to work in

8  basketball again.  Mr. Richardson is very conscious to not be

9  around college athletes.  He is working with younger youth

10 players, 7 to 14 years old.  He is trying to rebuild his life.

11 And he is always going to have this stain with him.

12          In terms of general deterrence, your Honor.  Prior to

13 September of 2017 I don't believe anybody working in college

14 basketball or amateur sports for that matter believed that an

15 NCAA violation would load to a federal criminal prosecution.

16 If you committed an NCAA violation, no one believed that they

17 were committing a violation of federal law.  I think after that

18 and after the publicity of this case everyone is on notice that

19 now if you do so you could be subject to federal prosecution.

20          Putting Mr. Richardson in jail or giving him a

21 sentence of incarceration, that is greater than necessary to

22 promote general deterrence.  Just the fact that he's been

23 through this process and he has lost everything provides a

24 story and a warning sign to the people who work in college

25 athletics that an NCAA violation, depending on severity, could

J669RICS

1    lead to a federal prosecution.

2              At this point, your Honor, we would suggest to the

3    Court that based on the 3553 factors and applying them to these

4    facts a sentence of probation is sufficient but not greater

5    than necessary to fulfill the aims of that statute.   Thank you.

6              I believe Mr. Richardson would like to address the

7    Court.

8              THE COURT:   Mr. Richardson you have an absolute right

9    to address the Court.   Is there anything that you wanted me to

10   know?

11             THE DEFENDANT:   I'm sorry, your Honor.   I didn't hear

12   you.

13             THE COURT:   Is there anything that you wanted me to

14   know?

15             THE DEFENDANT:   Yes.   Your Honor, as I stand here in

16   front of you today -- I initially wrote some notes down because

17   it meant a lot to me but I'm not going to go through my notes.

18   I'm going to speak from my heart.   I'm here asking for

19   forgiveness and leniency.

20             I want to address the Court and I want to apologize to

21   some very important people in my life, my wife who is here with

22   me.   I want to express deep sorrow and apologize for the

23   actions that I made, for the decisions -- the decision I made

24   in 2017.   There is no excuse for anything that was done and I

25   take full ownership.   I take full responsibility.   My friends

J669RICS

who I'm -- again, who have come to show support.  Your Honor,
I'm from New York City.  I've lived in every borough except
Staten Island.  I've been to five elementary schools.  My
mother had me at fifteen years old.  Again, that makes no
excuse.  I have no rhyme or reason for the decision that was
made.  I made it.

Your Honor, again, as I express sorrow and I try my
best to show respect to this Court, there were three components
that's gotten me through this.  Pretrial service has been
tremendous for me in the State of Arizona dealing with mental
health, addressing situations that I've dealt with for a very
long time, for my 46 years of existence, trying to figure
things out.

I'm sorry to any student athlete who I've humiliated,
embarrassed -- humiliated, embarrassed and put through this.  I
apologize.

Your Honor, the second piece has been my former
student athletes who have reached out to me, whether they call
me uncle or they call me their dad, I feel like I've let them
down.  And that's been so many of them, for about 20 years, who
have showed tremendous support, my former student athletes and
my former teammates, who a couple are here with me.

And finally, my family.  I would not have made it
through these 20 months living in Tucson, Arizona without my
family, without my wife being displaced, coming back to New

J669RICS

1    York City to find a job to try to help us as best we possibly

2    could; to empty out every single thing I've had in my 401K.

3         And I'd love to apologize to the University of Arizona

4    and President Robbins; never meant to shame them, disrespect

5    them, in the manner that I have.

6         And, again, wanting to make sure that I apologize to

7    any student athlete who had been affected through this, through

8    my decisions to do what was done and taking full responsibility

9    and ownership and making sure that, as my counsel alluded to,

10   the one thing in the world -- or one of the many things in the

11   world that I love, I've had part in making sure that I will

12   probably never coach college basketball again.  But I'll always

13   be a coach.  I'll always be a mentor.  And making a mistake,

14   I'm not sure if there's anyone better served in the world who

15   can express that mistake to anyone who would listen to deter

16   them from doing anything that I did.

17        THE COURT:  Thank you, Mr. Richardson.

18        In deciding what sentence to impose, in addition to

19   the sentencing guidelines and the commentaries thereto, I have

20   considered all of the factors set forth in Section 3553(a) of

21   Title 18 of the United States Code including the nature and

22   circumstances of the offense and Mr. Richardson's history and

23   characteristics.  I have determined the need for the sentence

24   imposed to reflect the seriousness of the offense, to promote

25   respect for the law, to provide a just punishment for the

J669RICS

offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes.  I've considered the need to avoid unwarranted sentence disparities amongst similarly situated defendants.

Having considered all of these factors, it is my intention to impose a sentence of three months incarceration, followed by two years of supervised release.  I will not impose a fine as I find that Mr. Richardson's current financial situation makes him unable to pay a fine.

I believe that this sentence is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in Section 3553(a)(2) for the following reasons.

I begin, as I must, by noting that I do believe that this is a serious crime.  It actually went beyond merely violating NCAA rules.  It clearly violated the criminal statute that Mr. Richardson pleaded guilty to, including the additional facts that he put on the record today, and it was a crime that was committed by someone who, despite perhaps a difficult childhood, first of all, knew better because he is an educated man, an intelligent man, but a man who didn't need to do this. Mr. Richardson was able to live out his dream of coaching some of the finest athletes in the country, at one of the finest universities, in one of the finest basketball programs in the country.  I have no doubt that there were financial

J669RICS

difficulties that he was experiencing, although by all accounts
he was earning certainly a living wage in Arizona and did not
need to go this route, but go this route he did.  He engaged in
this activity not on a one-off.  It wasn't a one-day decision.
It wasn't a onetime only thing.  It took place over several
months.  And as the government pointed out, at one point it was
Mr. Richardson himself that initiated the payment of a bribe.

His conduct also had real victims.  I do believe that
the institution of the University of Arizona has been
victimized by his conduct.  The letter that was submitted by
the general counsel talks about the loss of reputation of the
institution that it had built up so carefully over many years.
In fact, Mr. Richardson was part of that effort.  It caused
several student athletes to de-commit to the university.  And,
obviously, there are additional legal costs that they have to
endure and now, in all likelihood, an NCAA investigation which
may lead to some additional adverse consequences for the
university.

More importantly, from the standpoint of the Court,
the students -- the student athletes that Mr. Richardson
coached and mentored I believe were also victimized.  I reread
some of the telephone calls involving Mr. Richardson in
preparation for today's sentencing and he clearly, on any
number of occasions, told Mr. Dawkins and Mr. Sood and the
government cooperators or the government undercovers that he

J669RICS

1  would, in fact, be delivering those students to Mr. Dawkins.

2  And he took money for that.  So he clearly put himself ahead of

3  those students and their financial well-being in carrying out

4  these acts.  And the students, although they have not been

5  determined to be ineligible, did carry the possibility of --

6  they were exposed to the possibility that they would not be

7  able to compete at the college level.  Now, I don't know what

8  that means necessarily in terms of their future ability to play

9  in the NBA but that's a very real exposure to harm that

10  Mr. Richardson put those students through.

11          I do not believe that specific deterrence is a major

12  factor with respect to Mr. Richardson.  I don't believe that I

13  will ever see him again in this courtroom.  I don't believe

14  that he will reoffend, nor do I believe that he will violate

15  the conditions of supervised release.

16          And I think that general deterrence is also not an

17  overwhelming or not terribly weighty factor in connection with

18  his sentence.  As I indicated yesterday, the universe of

19  individuals who engage -- who are college coaches is fairly

20  limited.  I think that this case certainly has gotten a lot of

21  publicity and I think people have gotten the message both

22  through these related prosecutions and the more recent Varsity

23  Blues investigation being handled out of the District of

24  Massachusetts, that people have become very well aware, if they

25  weren't aware before, as to Mr. Mordock's point, that engaging

J669RICS

1    in this type of activity and taking money corruptly in

2    connection with the business of these institutions can result

3    in very serious consequences.

4           However, I do not believe that -- I do believe that

5    punishment in this case is important because of the very

6    serious actions that Mr. Richardson engaged in.  And that is

7    why I do believe that some period of incarceration is

8    necessary.

9           Mention was made of Mr. Bland and my sentence of him

10   yesterday to probation.  I do believe that these individuals,

11   Mr. Richardson and Mr. Bland, are different in connection with

12   their involvement and their levels of culpability in this case.

13   And it's not just the fact that Mr. Bland took substantially

14   less money that Mr. Richardson.  It was Mr. Richardson's

15   involvement and initiation of the receipt of bribes over a

16   period of months.

17          However, I do not believe that a sentence certainly as

18   much as the guidelines would require, which is 18 months at the

19   bottom, is necessary.  And because we already know what the

20   sentence will be for certain of the codefendants in this case,

21   namely Mr. Dawkins and Mr. Code, that -- and I do find that

22   Mr. Richardson is less culpable than they.  I do think that a

23   sentence of three months is appropriate both for all the

24   reasons that I just discussed and also because I read very

25   carefully the letters that were submitted, the submissions by

J669RICS

| | |
|---|---|
| 1 | Mr. Mordock, and I have no doubt that the picture of |
| 2 | Mr. Richardson that was provided to me by his friends is real. |
| 3 | I do believe that he is by and large a very good person who has |
| 4 | done a lot of good over the course of his life.  I have no |
| 5 | doubt that he has positively impacted the lives of dozens, if |
| 6 | not hundreds, of young men over the course of his career and |
| 7 | young men of color who, like him, perhaps had difficult |
| 8 | childhoods and overcame a lot of adversity in order to be able |
| 9 | to compete at that very high level.  I'm sure that having |
| 10 | someone like Mr. Richardson at the University of Arizona made |
| 11 | it much, much easier for them to navigate being away from home |
| 12 | and being in a college environment and being the center of a |
| 13 | lot of attention including attention by individuals like |
| 14 | Mr. Dawkins and Mr. Sood and the others.  So, I have no doubt |
| 15 | that Mr. Richardson played a very important, almost paternal, |
| 16 | role in the lives of those individuals.  So I do believe that |
| 17 | some leniency -- that he merits a great deal of leniency |
| 18 | because of the largely good life that he has led. |
| 19 | And so with that, does counsel know of any legal |
| 20 | reason other than what has already been stated as to why I |
| 21 | should not impose the sentences I've indicated? |
| 22 | Mr. Solowiejczyk. |
| 23 | MR. SOLOWIEJCZYK:  Your Honor, we may have missed it |
| 24 | but there was also forfeiture in the amount of $20,000.  You |
| 25 | may have mentioned the $100 special assessment. |

J669RICS

1          THE COURT:  I have not but I will.

2          MR. SOLOWIEJCZYK:  My apologies.

3          THE COURT:  I'm not quite done.

4          MR. SOLOWIEJCZYK:  No legal reason that sentence can't

5   be imposed.

6          THE COURT:  Very well.  Mr. Mordock.

7          MR. MORDOCK:  Your Honor, there is no legal reason the

8   sentence can't be imposed.

9          THE COURT:  Very well.  In that event, it is the

10  judgment of the Court that Mr. Richardson be sentenced to three

11  months imprisonment on the one count of conviction.

12          The conditions of probation -- the standard conditions

13  of probation one through twelve should apply as well as the

14  following mandatory and special conditions.

15          The mandatory conditions are that you not commit

16  another federal, state, or local crime;

17          That you not unlawfully possess a controlled

18  substance; and that you should refrain from the use of a

19  controlled substance and submit to one drug test within fifteen

20  days of release and at least two drug tests thereafter as

21  determined by probation.

22          The special conditions are that you not incur new

23  credit charges or open additional lines of credit without the

24  approval of the probation officer unless you are in compliance

25  with the installment payment schedule.  And you must provide

J669RICS

1    the probation officer with access to any requested financial

2    information.

3              I will not impose the special condition that the

4    probation recommends concerning search of your residence.

5              And if you do live outside of the district it is

6    recommended that you be supervised by the district of

7    residence.

8              You are ordered to pay the mandatory special

9    assessment of $100 which shall be due immediately.

10             As I indicated, I will not impose a fine as I find

11   that Mr. Richardson is not able to pay a fine.  And that you

12   are ordered to forfeit $20,000 to the government as I believe

13   you have already agreed to do.

14             Are there any open counts concerning Mr. Richardson?

15             MR. SOLOWIEJCZYK:  Yes, your Honor.  The government

16   would move to dismiss all open counts at this time.

17             THE COURT:  That application is granted.

18             That constitutes the sentence of the Court.

19             Mr. Richardson, I believe that I sentenced you below

20   the stipulated guideline range.  In your agreement with the

21   government that means as a practical matter that your appellate

22   rights are severely restricted.

23             However, Mr. Mordock, will you assure me that you will

24   promptly and thoroughly discuss with Mr. Richardson his

25   appellate rights and the effect of the plea agreement on his

J669RICS

1      appellate rights?

2               MR. MORDOCK:  I will your Honor.

3               THE COURT:  Mr. Mordock, do you have any other

4      applications?

5               MR. MORDOCK:  No, your Honor.

6               THE COURT:  In that event, we are adjourned.  And

7      Mr. Richardson, good luck to you, sir.

8               MR. MORDOCK:  Thank you, Judge.

9               MR. SOLOWIEJCZYK:  Your Honor, sorry.  Did you want to

10     set a surrender date at this time?

11              THE COURT:  Six weeks?

12              MR. MORDOCK:  Yes, your Honor.  Six weeks is fine.

13              MR. SOLOWIEJCZYK:  Can we have one moment, your Honor.

14              THE COURT:  Sure.

15              (Counsel confer)

16              Mr. Mordock, one other thing.  If he's not designated

17     within six weeks you can make application to enlarge that so he

18     can self-surrender.

19              MR. MORDOCK:  Yes, your Honor.

20              THE COURT:  Ms. Rivera.

21              THE DEPUTY CLERK:  July 18, 2019.

22              THE COURT:  Anything else?

23              MR. MORDOCK:  That would be it.

24              THE COURT:  We're adjourned.

25              (Adjourned)